UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. <u>22-80073-CR-MIDDLEBROOKS</u>

UNITED STATES OF AMERICA,

    v.

JOHN R. MOORE, JR., and

TANNER J. MANSELL,

          **Defendants.**
_____/

### GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANTS' OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT

The United States hereby files its response in opposition to the Defendant's Objections to Presentence Investigation Report ("PSR") [D.E.-102], and prays this Honorable Court will deny said Motion in all respects, and in support thereof would show:

On Motion, defendants raise various objections to the PSRs provided by the Court's Probation Officer.[1] Since many of the objections are raised with respect to identical provisions in the two PSRs, they will be addressed jointly by the government in the order raised. Objections unique to an individual defendant will be identified as such and handled separately.

    **I. The Offense Conduct.**

Defendants assert a blanket objection to paragraphs 3 through 25 of the PSR claiming that " . . . the Defendants contested these assertions at trial . . . ." D.E.-102 at 1. This is not factually accurate since numerous of the conduct paragraphs address actions and events adduced

---

[1] The PSR for defendant Moore is D.E.-97; the PSR for defendant Mansell is D.E.-101.

by trial evidence and exhibits which were *never contested* . By way of example, paragraph 8 of the respective PSRs recite the fact that the defendants first took their passengers to snorkel with bull sharks in federal waters offshore of Jupiter Inlet on the relevant day. The government established this through witness testimony, photographs, and the meta-data GPS data from the shark diving boat. Nowhere during the proceeding did the defendants challenge that evidence. To the extent that specific objections are identified, as required by the rules of court and precedent, they are addressed seriatim, below:

¶ 8:   Defendants challenge the statement that their business relied on the presence of sharks claiming no reliable testimony was elicited regarding this matter.

That conclusion is a reasonable inference to be drawn from the totality of the evidence n this case, including the testimony of the two passengers, who described their presence that day as a result of their efforts to arrange a vacation specifically focused on diving/snorkeling with sharks. At least one witness also described a trip earlier in the vacation that also involved interacting with sharks. In fact, the parent company employing the defendants was identified as "Florida Shark Diving" – the name employed by witnesses throughout the trial. The passenger witnesses also described the photo and video packages marketed by the company for extra fees and clearly indicated the entire focus of their trips was related to shark encounters.

The defendant's efforts to relocate to a particular dive site to allow their passengers to interact with the large tiger shark "Jenny" further supports the challenged statements.

Finally, the dock master at U-tiki and Officer Partelow of the Florida Fish & Wildlife Conservation Commission each referenced the nature of the company's business and their familiarity with the shark viewing charters. Notably, Officer Partelow testified that he contacted the boat operated by the defendants on August 10, 2020, in part, by observing the large shark-

diving cage on the vessel. That cage appears in exhibits presented by the government at trial. See Government's Ex. 43.

From all the evidence adduced and the reasonable inferences properly drawn therefrom, the statements in paragraph 8 are accurate and well-founded.

¶ 10:   Defendants challenge, without argument or supporting references the assertion that their vessel was in federal waters as it travelled from the first snorkeling site with the bull sharks to the position where they encountered the orange poly-ball marker, and their relative position to the *Dayboat III* as it deployed the critical second set.

It was established at trail that the defendants chummed for sharks to lure them to their customers. This was only permissible in federal waters. Their vessel's position at the initial bull shark site was established by the GPS meta-data from passenger recordings introduced at trial. Likewise, the time and location of the poly-ball marked set of the shark long-line was established by the observers log notes. See Government Ex. 23.

S/A Boots established that the tracking exhibits reflected the times, nominal course lines, and locations of the long line set and the shark diving boat over the relevant period. See Government Ex. 42, 44.

The speed of the defendants' vessel is calculable from the meta-data associated with its travel from point to point which demonstrates that they were travelling at approximately 13 knots to their first dive spot. From that dive spot to the poly-buoy, a distance of 4.68 nm would take about 22 minutes at that speed. The time stamp on the bull shark site was 12:36 pm, and the passengers gave their estimates of how long they stayed at that site. The *Dayboat III* began it's set at 1:04 pm. D.E.-23. Since the shark diving boat had to have left the bull shark site between

12:36 and 1:04 pm, it would necessarily have arrived at the poly-buoy location no later than approximately 1:22 pm. It is simple navigation to determine that the vessels necessarily passed less than 1 nm apart. See Government Ex. 44

The fact that neither the NOAA observer nor the two Kuehl witnesses saw the others' vessels is not dispositive of anything. The observer was focused on his duties aboard the fishing vessel as he described them. The Kuehls, as both admitted on direct examination, lacked any experience or knowledge regarding commercial fishing that would allow them to identify a shark fishing boat even had they noticed it. Their testimony was simply they didn't notice such a vessel.

The helmsman of the dive boat – defendant Moore, would necessarily and logically be watching for danger from other vessels and likely would have noticed the *Dayboat III* in such relatively close-quarters and perfect conditions. His prior commercial fishing experience, testified to by the U-Tiki dockmaster, and his long-time experience would provide him the knowledge to recognize the fishing vessel for what it was.

¶ 11:   Defendants variously contest the existence of evidence regarding their statements to their passengers regarding the long line, how the passengers became involved in the retrieval of the fishing gear, and the depth of the water. These arguments are not well-taken.

The NOAA observed testified he recorded the water depths on his summary, Government Ex. 23, and that the depth of the long-ling set was between 80 and 82 feet. Further, he and every witness questioned on the point agreed that the seabed could not be seen from the surface.

Defendants' recollection of the testimony of the Kuehl women is also flawed. Camryn Kuehl testified that no sharks could be seen on the line until after at least 10 minutes of retrieval

efforts. Her sister-in-law did claim that she could see a lemon shark almost immediately - a claim lessened by the balance of her testimony.

The ladies also testified that upon encountering the poly-ball and attached vertical line they had no idea what it was or its significance until the defendants started describing their claimed interpretation of what they saw and why it was illegal. No testifying witness ever claimed they were hauling on the line based on their independent knowledge and assessment of its legality and neither of eh passengers demonstrated any clear concept of what sharks were "endangered" and stated they relied on the defendants to identify the sharks it was harvesting. Thus, the conclusion that the passengers were persuaded to participate based on the claims asserted by the defendants is a reasonable conclusion based on the evidence of record.

¶ 12:   Contrary to the claims by defendants, evidence was adduced at trail that defendant Moore had a commercial fishing background. The dock manager from U-Tiki, Christopher Perez, who the defense asserted knew defendant Moore so well that he qualified as a character witness, advised that he knew of Moore's commercial fishing history. Supporting that testimony, although not evidence itself, was the opening statement of counsel for defendant Moore who advised the jury during his lengthy description of Moore's background that he had for a significant time period been a commercial fisherman.

Defendants' claim that the poly-ball was "faded and barely legible" clearly had no effect when made to the jury and should be ignored here. On various of the video exhibits and the stills taken therefrom the name "ALBI" is clearly visible and legible. See, e.g., Government Ex. 25, 46.

¶ 13:   The paragraph as written already reflects that the name on buoy was not the correct name as required by regulation but that such a discrepancy was of no legal relevance herein. The argument is essentially moot.

¶ 14:   The arguments raised are simply inconsistent with the verdicts of the jury with regard to the marked buoy.

The quantities of line and tackle removed from the water by the actions of the defendants was fairly established by the detailed notes of the NOAA Observer, Government Ex. 23, which were also consistent with the numerous videos and photographs of the material taken on board the shark diving boat and exhibited later in the day at the U-Tiki pier.

S/A Boots testified regarding his review of the video footage during the illegal interference with the long-line and determined that at least 14 legally harvestable sharks were cut from the line. This is a conservative assessment in light of the eye-witness calculations maintained by the contemporaneous internet postings of Camryn Kuehl, Government's Ex. 43, wherein she at first identified 14 sharks, by specie that had been "saved so far" and later added a photo captioned "we saved at least 19 sharks today.

The Kuehl's testimony and the videos established that only the defendants did the actual cutting loose of the sharks from the long line.

¶ 15:   The relevant times and locations, as noted, supra, are derived from the meta-data and GPS information gleaned from the Observer's Summary, Government Ex. 23, and the various mobile devices that captured video on the date in question. Defendants apparently don't recognize that anytime after 1:04 pm – the beginning of the set by the *Dayboat III*, anyone – as they did – could approach the poly-buoy and begin interfering with the set. If the defendants'

vessel left the bull shark site at or about 1:00 pm as appears likely from the available timeline, they would have passed the shark fishing boat and arrived at the poly-ball approximately 20-25 minutes later. At that juncture the *Dayboat III* would have been more than three-quarters through the 3.5 nm set, which was complete by 1:35, per the Observer. Id. A video of the first shark retrieved, at 2:18 pm, places the incident almost a half mile into the long line set, a fact confirmed by the re-direct testimony of Special Agent Boots. See also, Government .Ex. 24, 24A.

Defendants' objections to the details of their co-worker's call to the NOAA hotline are remarkable, given how heavily they relied on her call as a putative effort by them to report a supposed illegal shark fishing operation. While not introduced in substance at trail due to hearsay issues, some references were made to the content of the call being related to a supposed shark-fishing event off Jupiter Inlet.[2] While not placed before the jury, the nature and the content of that call are relevant to the Criminal Conduct narrative and may be properly considered by the Court for purposes of sentencing.

¶ 16: Defendants'' reliance on the testimony of Leslie Kuehl regarding any radio calls to authorities is misplaced. She was unable to say to whom any radio call was made, did could not recite and details of the putative conversation, and demonstrated her bias by the unsolicited statement that she was a "shark activist."

In contrast, S/A Boots related the procedures for the various marine enforcement agencies, including the U.S. Coast Guard, to monitor, record, and forward law enforcement reports. No such recordings or reports from Moore were ever located.

---

[2] In the Government's Response in Opposition to Defendants' Joint Motion for Judgment of Acquittal or, in the Alternative, for a New Trial, D.E.-95, the government in rebutting an argument proffered by the defense, provided as Exhibit 1, thereto, the NOAA Hot Line report related to Janelle Van Ruiten's contact with NOAA to demonstrate that virtually the entire report consisted of false information.

The times identified in the challenged paragraph are accurate, and Officer Partelow did testify regarding the statement by defendant Moore that the divers on his boat were cutting sharks loose. The fact that only Moore and Mansell were actually engaged in that cutting was established ta trial by the video evidence and the testimony of the Kuehls.

¶ 17: Defendants' statements regarding Officer Partelow's photographs are quite simply untrue. Government's Exhibits 40 and 41 are accurately described in the challenged paragraph and were introduced, without objection, at the trial through the testimony of the Officer.[3] He further stated that he saw no orange poly-ball, and had it been there he would certainly have taken a photo of it as important evidence. He also testified regarding his directions to Moore regarding the line and gear being evidence and that Moore was to retain it. Which Moore did not do. In fact, surveillance video from the U-Tiki pier shows Moore cutting additional items of hardware from the line while at the dock, awaiting his next charter. He can be seen placing these items into the same 5-gallon white bucket that appears in videos taken by the Kuehls during the haul-back efforts, and also includes bait fish, hooks and ganions. A surveillance at 5:47 pm shows Moore putting that bucket with the gear back on his vessel as well as showing him with several of the red/pink wights. He then releases the mooring line, picks up 2 more weights and places them on the vessel, and departs the area by water. None of that gear was ever turned over as directed by Officer Partelow and was not mentioned by Moore that evening when the Officer contacted him about the location of the evidence.

¶ 23: Whether the defendants assisted in pushing the cart from the dock to the disposal location is not clear in the evidence of record. Only the limited areas under video surveillance

---

[3]The photographs were also identified on the Government's Exhibit List and were included in the set of government trial exhibits provided to the defense in advance of trial.

can be relied upon. It is certain, however, that Moore was present when the gear was being disposed of and he took no measures to preserve the evidence as he had been directed to do, and, at best, stood by and let others unaware of the Officer's interest in recovering that evidence dispose of it.

¶ 25:   The statement accurately recounts Officer Partelow's testimony as to what Moore said to him. There is no contrary evidence. The dock master actually testified that hew as not there when the line was dealt with and had no knowledge of its disposal. Further, he had no awareness of Officer Partelow's directions to defendant Moore.

## II. Victim Impact.

The defendants object to the conclusions of paragraphs 27 through 30 regarding the loss to the victims. Although they assert the losses are not yet ascertainable, in fact they are. S/A Botts detailed a reasonable calculation methodology at trial, tied to the actual values expended by the owner entity of the *Dayboat III* and the government supported the valuations of the lost gear and sharks by submitting settlement sheets and trip tickets spanning the period at issues. See Government's Ex. 5-8. These calculations were further buttressed by the testimony of one of the managing partners of the owner entity, who explained how income and profit calculations were derived and how the victim skipper and crewman would normally be compensated.

Accordingly, should the Court wish to conclude this matter in a single hearing, the United States believes that could be easily accomplished at the scheduled sentencing proceeding.

Defendants specifically argue with respect to paragraph 25 that the monofilament main line and approximately 6 clips recovered by Officer Partelow from the dumpster in 2020 should be deducted from any loss figure. The longline, after the treatment accorded it by the defendants is unserviceable for use as a fishing line. The return of six gagnions to the victim would have a

miniscule effect on the loss figure, but should it be possible, the United States would not oppose that small adjustment to the loss figure.

Defendants are also arguing, in effect, that since the *Dayboat III* had some success, by harvesting sharks in haul 1 and haul 3 that they should take some benefit therefrom. That is an ill-founded argument, since the criminal conduct affected only Haul 2 – the second set. That set did recover some harvestable sharks as reflected in Exhibit 23. However, that doesn't account for the lost opportunity of approximately 100 hooks that held neither sharks not by-catch when they were hauled back through the interference of the defendants. Utilizing Camry Kuehls posting claiming 19 sharks released, Government Ex. 43, and a calculation based on the photos and video of their activities that day, the criminal interference through the pre-mature removal of the set from the water undoubtedly had an impact on the recovery rate of the fishing vessel, to its loss. All those additional hooks should have been allowed to "soak" and perform their intended service. That loss should not be offset by any success the fishermen may have had with the other the other 2 sets with which defendants had no interaction. That is precisely why S/A Botts conducted his loss analysis bases on sets and not entire trips. To do otherwise would understate and minimize the true impact and loss caused by the relevant criminal conduct.

### III.  Obstruction of Justice – Defendant Moore.

Contrary to the claims on Motion, defendant Moore demonstrated virtually no effort to comply with the direction from Officer Partelow to secure the evidence of line and gear while the Officer sought to locate the fishing vessel described by Moore when they met at about 5:25 pm.

Moore concealed from the Officer that the line they had found and had interfered with had a marked buoy, but instead falsely claimed that he came across a buoy with a lemon shark entangled, and that he and the others were pulling in the line and cutting free the catch. Photos

from the vessel prior to that cellphone call to Officer Partelow show the immense amount of line on the boat and the clearly marked polybuoy. See, e.g., Government Ex. 33.

The Officer spoke Moore and took pictures of the heap of line, a hooked bait fish, and some of the line weights. Government Ex. 40, 41. Defendant Moore expounded to the Officer regarding the strength and nature of the shark set line and also stated that a green boat was out illegally shark fishing. Although a significant pile of material was in the well-deck of the boat, the marked orange polybuoy was not there and never mentioned by the defendant Moore or his passengers. Officer Partelow was clear in his testimony that had the polybuoy been present, he would certainly have photographed it as well.

Moore returned his passengers to the Jupiter Inlet dock a little after 5:30 pm according to time stamps on the facility's video cameras. Government Ex 13-18. Thereafter, Moore, passengers on his boat, and passerby's can be seen cutting gear from the line and taking it, despite Officer Partelow's direction to Moore to leave it on the dock for later collection as evidence. Id. Moore made no apparent effort to secure the evidence and indeed contributed to the problem by putting some of the gear into a bucket he later placed back aboard his vessel. All that evidence subsequently disappeared, as had the marked orange poly-ball. When the Officer returned to the dock and realized the evidence was gone, he called Moore at 9:15 pm and was told by Moore that it had been thrown in a dumpster. Further investigation revealed only monofilament line and six gagnions remained – no hooks, buoys, or weights were ever to be found. Moore was, at least, on the pier and party to the removal and disposal of the evidence. His apparent concurrence in those actions clearly reflects an effort to dispose of what he then knew to be evidence of his and his co-defendant's illegal interreference with a lawful fishing endeavor.

11

Such conduct over the course of a 4-hour period was clearly intended to impede the investigative efforts that Officer Partlow had told Moore would be forthcoming.

### IV. Analysis.

¶ 81 -**Tanner Mansell:** Defendant objects to the Probation Officer's conclusion that, based on an analysis of his employment activities, and alternatives that may be available, he could readily increase his earnings, and therefore be able to support the payment of any Court ordered restitution, as well as a criminal fine. He simply claims to be fully and gainfully employed.

The United States supports the conclusion of the Probation Office on this point and believes both a restitution order and the imposition of a criminal fine can be managed by the defendant.

¶¶ 80, 83, 84 – **John Moore:** Defendant asserts undisclosed objections to these paragraphs which appear to reflect undisclosed wealth or an unstated source of income. The United States is not in a position to respond to the vacuum in defendant's argument.

The United States does note that there is no reflection in the income disclosures by defendant for the gratuities received for his services as an operator of a charter vessel from his passengers. Testimony at trial was elicited that acknowledged the payment of such gratuities, as well as income to the operator and crewman when they supply other services such as videography or still photos. The reference to unexplained Venmo and cash from unidentified sources seems a likely explanation, although it does not account for the anomalous income claims and tax return data. Should defendant in fact offer supplemental documentation or argument, the United States would reserve its right to further respond.

**V. Conclusion.**

Based on the foregoing, the United States respectfully submits that defendants have failed to identify any deficiencies in the PSRs that would warrant an alteration of the relevant commentary, conclusions, and calculations. And their Objections should be **DENIED**.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:   /s/ Thomas A. Watts-FitzGerald
Assistant United States Attorney
Florida Bar No. 0273538
99 Northeast 4th Street
Miami, Florida 33132-2111
Tel: (305) 961-9413
Email: thomas.watts-fitzgerald@usdoj.giv

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 25, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

  /s/ Thomas Watts-FitzGerald
Assistant United States Attorney